NELLIE H. KASTEN, Executrix, *v.* LANCE L. KASTEN.

[No. 37, October Term, 1931.]

410

*Decided December 4th, 1931.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, PARKE, and SLOAN, JJ.

*Forrest Bramble* and *Randolph Barton, Jr.,* with whom were *J. Milton Lyell* and *F. Fulton Bramble* on the brief, for the appellant.

*J. Cookman Boyd* and *J. Cookman Boyd, Jr.,* for the appellee.

URNER, J., delivered the opinion of the Court.

The refusal of the lower court to direct a verdict for the defendant, on an issue of undue influence, in the trial of a

caveat to a will, is the principal ruling to be reviewed on this appeal. The contested will was executed on May 16th, 1924, by Charles F. Kasten, of Baltimore, who died in July, 1929. He was survived by his wife, Nellie H. Kasten, who was made executrix of his will and sole devisee and legatee of his estate, which is estimated to be worth about $30,000. The caveator (plaintiff) is Lance L. Kasten, whose right, as a son of the testator, by a former marriage, to question the validity of the will, was unsuccessfully disputed by the caveatee (defendant), at the trial of a separate issue as to his paternity. *Kasten v. Kasten,* 159 Md. 329, 150 A 854. The verdict of the jury at the subsequent trial on the issue of undue influence having also been in favor of the plaintiff, the present appeal has been taken by the defendant to have reviewed a number of rulings in addition to the one already mentioned.

There was legally sufficient ground in the evidence for a conclusion by the jury that the defendant was actively interested in alienating her husband from her stepson. It was testified by the plaintiff that his stepmother, in an effort to expel him from his father's home, threw his clothes out of the second-story window, but that his father afterwards said to him privately: "I am sorry, my son—I can't do anything. Keep quiet and everything will turn out all right." A detective was employed by the defendant to investigate the plaintiff's birth and parentage with a view to proving that he was not the son of his reputed father. It was made a part of the detective's duty, as he testified, to observe and report to the defendant whether any meetings occurred between her husband and the plaintiff, who were not living together at that period. The testimony of the detective was further to the effect that when he reported to the defendant that he was satisfied the plaintiff was the son of her husband by his former wife, the defendant said that she had not employed the witness to obtain that kind of information. The defendant was quoted as saying to the detective that her husband believed the plaintiff to be his son, but that her own belief was to the contrary. No intimation was given the testator

as to the defendant's employment of the detective or as to the fact and object of his investigation.

Two witnesses attributed to the defendant the following declarations, respectively: "I know my husband, I can make him do anything I want him to do, I have had him make a will and seen to it that Lance will not get a five-cent piece." "Well, I can make my husband do anything and I will see that Lance won't get a cent from Dr. Kasten. I have had him make the will, I saw to that. I had him—I saw to it that Lance wouldn't get a cent." A written and sworn statement by the testator, found in his safe deposit box, denied that the plaintiff was his "legal son" and explained that the paper was intended for his wife's protection after his death. It was dated February 12th, 1924, but as late as two weeks before his death the testator referred to the plaintiff as his son by a former wife, according to the testimony of Dr. Aldridge, his dentist, and spoke with pride of the plaintiff's war record, including his citation for bravery. In a bill for divorce which the testator had filed against his former wife he mentioned the plaintiff as their only son. A copy of the bill was given by the testator to the plaintiff, who returned it with notations that the charges of adultery against his mother were "lies". It was admitted by the plaintiff that he had written notes to his father complaining of his failure to make some gifts of money which had long been promised, and containing some disrespectful language. The plaintiff does not attempt to excuse those communications, which he says were provoked by the defendant's attitude towards him, and by her success in securing from his father substantial gifts for his stepbrother, while depriving the plaintiff himself of corresponding favors by her hostile influence. No reply was made by the testator to the plaintiff's impatient expressions, and their subsequent relations, as described in the plaintiff's testimony, appear to have been unimpaired. Shortly before the execution of the will a telegram purporting to be from L. R. Thompson in Washington was received by the testator. It stated that his son, the plaintiff, was suing him and his

wife. But it was denied by the plaintiff that he was the author of the telegram or that he caused it to be sent.

There is no dispute as to the testator's physical and mental vigor at the time of the execution of his will. The disposition of his estate by that instrument would doubtless be regarded as entirely natural under normal family conditions. If his widow were the mother of both of his sons, they might equally expect to share eventually in their father's estate as objects of her bounty. But in view of the actual relations between the sole beneficiary of the will and the plaintiff, its provisions operate to exclude him from any such prospect of future participation. The declarations imputed to the defendant in the testimony were an acknowledgment that she possessed and exerted an influence which produced that result. While the defendant denied that she made the statements quoted by witnesses for the plaintiff, it was the right of the jury to believe their testimony as against her denial. The evidence as to her admissions was clearly competent as reflecting upon the issue to be determined. *Davis v. Calvert,* 5 G. & J. 269; *Canton v. McGraw,* 67 Md. 583, 11 A. 287; *Hiss v. Weik,* 78 Md. 439, 28 A. 400. The ably argued question is whether the declarations, when considered in connection with other evidence in the case, have a legally sufficient tendency to prove that the will was procured by an influence which the law condemns as undue. It is contended that the admissions do not necessarily imply that the defendant so dominated the will of the testator as to destroy his free agency, and that there is no other evidence tending to prove the exertion of such an influence.

The declarations in question involve an assertion by the defendant that she was able to control her husband's volition and had caused him so to make his will as to exclude the plaintiff from any benefit under it which he might otherwise have received. It may be inferred from the language of the admissions that the exercise of influence by the defendant was required to accomplish her stepson's exclusion from the will. The testimony further admits of the inference that the testator was subservient to his wife's prejudice against

the plaintiff. The actual relationship of the testator and the plaintiff as father and son has been formally adjudicated. It was expressly declared as a fact by the testator before and after the time when his will was executed. The intimacy and circumstances of their associations during the years of the plaintiff's childhood and adolescence tend to confirm that acknowledgment. Yet the will was accompanied by the testator's written statement that the plaintiff was not his "legal son," but "a foster child" brought to his home by "a woman who was married to" him, and from whom he was afterwards divorced. As already noted, the statement included an explanation that it was made for the defendant's protection. Subsequently she made extraordinary but futile efforts to obtain proof that the plaintiff was not the son of her husband. The jury could find from the evidence that the testator was in reality the plaintiff's legal father and that the denial of that fact was an injustice which would not have been done voluntarily. It could rationally have seemed to the jury hardly conceivable that a father would disown his son except under the dominion of an influence which he was unable to resist.

In view of all the evidence, and the inferences of which it admits, we agree with the conclusion of the trial court that the case could not properly be withdrawn from the jury. The fact that the will was prepared under instructions given by the testator alone to his attorney is not sufficient to neutralize the effect of the evidence from which, if believed by the jury, it was legally permissible to infer that the testamentary act was induced by an influence which unduly controlled the testator's volition. By instructions granted at the defendant's request, "undue influence" was correctly defined, and the plaintiff was charged with the burden of proving that such an influence procured the will. But the prayer of the defendant for a directed verdict in her favor on that issue was properly refused.

There were numerous exceptions to the admission of testimony as to the defendant's employment of a detective to investigate the plaintiff's parentage, and as to statements by the defendant to the detective and his associates. The main

ground of these exceptions is that the events objected to relate to a period several years after the date of the will and tended to prove no facts by which its execution could have been influenced. The fifth prayer of the defendant sought, without avail, to enforce the same objection. But as the evidence reflected upon the defendant's attitude towards the plaintiff and the testator, and her anxiety to disprove the relationship on which the plaintiff's right to contest the will was dependent, we think the adverse ruling on the objections was correct. Most of the other evidence exceptions were abandoned. There was no error in any of the rulings to which they refer.

The sixth prayer of the defendant proposed to have the jury instructed that it was not sufficient to support the theory of undue influence that the jury should find the defendant to have been hostile to the plaintiff or that she tried to keep him from coming in contact with the testator, or tried to persuade the testator to leave all of his estate to the defendant, regardless of what the jury might believe from the evidence to have been her actions or attitude, unless they should further find that she did in fact influence the testator in the making of his will, to a degree amounting to force or coercion and destroying his free agency. The defendant's eighth prayer would have instructed the jury that unless they believed the defendant in fact made the statements attributed to her by certain witnesses for the plaintiff, the other evidence in the case was not of itself alone legally sufficient to entitle them to find that the will in controversy was produced by undue influence exercised by the defendant, as defined in other instructions. These prayers were rightly refused, as they segregated facts in derogation of their proper relation to the issue.

*Rulings affirmed, and case remanded.*